--------

## Case No. 8,476.

### In re LONG et al.

[7 Ben. 141;[1] 9 N. B. R. 227.]

District Court, S. D. New York. Feb., 1874.

BANKRUPTCY — JOINT AND SEPARATE ESTATE — AGREEMENT BY ONE PARTNER TO PAY DEBTS OF FIRM.

1. A firm composed of two members was dissolved by agreement, one partner, L., taking the property and agreeing to pay the debts of the firm. The firm was afterwards put into involuntary bankruptcy. The assignee in bankruptcy received property which had been property of the firm, and also individual property of L., and debts were proved against the firm and also against L. individually. One creditor, M., filed proofs of debt both against the firm and against L., both founded in part on firm notes and in part on individual notes of L., but all given for goods sold by M. to the firm: Held, that, as the bankruptcy proceedings were against both of the copartners, as such, the provisions of the 36th section of the bankruptcy act [of 1867 (14 Stat. 534)] must apply, even though there was no joint property.

[Cited in Re Litchfield, 5 Fed. 50.]

2. The transfer of the firm property to L. having been made honestly and in good faith, upon a dissolution, and for a valuable consideration, and without any fraud or collusion between the partners to defeat the rights of the joint creditors,

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

the joint property became, by the transfer, the separate property of L.

[Cited in Re Tomes, Case No. 14,084; In re May, Id. 9,328; In re Hamilton, 1 Fed. 812.]
[Cited in Warren v. Farmer, 100 Ind. 597.]

3. M. was entitled to be admitted to the list of L.'s separate creditors, and to share in dividends out of his separate estate. The cases of Howe v. Lawrence, 9 Cush. 553; Robb v. Mudge, 14 Gray, 534; and Wild v. Dean, 3 Allen, 579, criticised.

[Cited in Re Lloyd, 22 Fed. 90.]

[It is provided by section thirty-six of the bankruptcy act, that "where two or more persons who are partners in trade shall be adjudged bankrupt, either on the petition of such partners or any one of them, or on the petition of any creditor of the partners;" "the joint stock and property of the co-partnership, and also all the separate estate of each of the partners, shall be taken" on the warrant to be issued; and that "the net proceeds of the joint stock shall be appropriated to pay the creditors of the co-partnership, and the net proceeds of the separate estate of each partner shall be appropriated to pay his separate creditors; and if there shall be any balance of the separate estate of any partner, after the payment of his separate debts, such balance shall be added to the joint stock for the payment of the joint creditors; and if there shall be any balance of the joint stock after payment of the joint debts, such balance shall be divided and appropriated to and among the separate estates of the several partners, according to their respective right and interest therein, and as it would have been if the partnership had been dissolved without any bankruptcy; and the same so appropriated to the separate estate of each partner shall be applied to the payment of his separate debts."][2]

Prior to the 7th of December, 1869, the bankrupts, [Walter P.] Long and [Albert B.] Corey, were partners in trade. On that day they executed a written agreement, dissolving the copartnership from and after that date, and further agreeing, (1) that Corey should receive, as his share of the capital, business and good will of the late firm, the amount theretofore agreed upon by the parties; (2) that Corey thereby assigned to Long all his interest in all debts payable to the late firm, and all his interest in the property, effects, capital and good will of the late firm; (3) that, in consideration of provisions one and two, Long should pay all debts against the late firm, and hold Corey free from all claim thereon. On the 13th of January, 1870, Corey brought a suit in a state court against Long, in which a receiver was appointed of the property which had been the copartnership property of the late firm. On the 15th of January, 1870, the receiver took possession of such property. On the 22d of April, 1870, William Macfarlane, as a creditor of the bankrupts, as such co-

[2] [From 9 N. B. R. 227.]

partners, commenced proceedings in this court against them to have them adjudged involuntary bankrupts, whereon they were adjudged bankrupts on the 30th of April, 1870. Creditors of the copartnership proved debts, and elected William P. Buckmaster to be assignee, and the usual assignment was made to him May 25th, 1870. Under an order of the state court, the receiver delivered over to the assignee the property in his hands.

The assignee collected money from such property, and also money which was the separate estate of Long. In March, 1872, the assignee paid out of the proceeds of the property received from the receiver a dividend of four per cent. on the copartnership debts proved. Macfarlane, in his petition in bankruptcy, set forth as his claims against the copartnership, five notes of the firm and one of Long individually. On May 23d, 1870, he filed a proof of debt against the bankrupts as copartners, in which he included all those six notes, stating that they were given for merchandise sold by him to the firm, and on that he received the dividend of four per cent. In July, 1873, he filed a proof of debt against Long individually, including the same six notes, and seven others, and stating that Long had assumed to pay the indebtedness of the firm, and that thereupon the notes became the separate and individual indebtedness of Long to him. He credited the amount of the dividend received by him from the copartnership estate. Three individual creditors of Long proved claims against his separate estate, and on their application proceedings were taken to re-examine Macfarlane's proof of debt of July, 1873. It appeared that the agreement of December 7th, 1869, was never shown to any of the creditors of the firm, and that none of them had released Corey from the debts of the firm. Four of Long's individual notes were given to Macfarlane for goods sold by him to the firm before its dissolution. Macfarlane testified that, when they were given, Long told him that the firm was dissolved, and that he had assumed the debts, and would settle for them with his individual notes. The evidence also showed that, after December 7th, 1869, Long signed, in the name of the firm, and gave to Macfarlane, a note of the firm's for goods bought by the firm from Macfarlane prior to its dissolution, and for which no note had before been given. Long, in his testimony, expressed himself surprised to find he had given the four individual notes, and accounted for his doing so by saying that he could not tell how it happened, but supposed he did it hastily. Some of the merchandise bought from Macfarlane, for which such four notes were given, passed into the hands of the receiver. Some, but not all, of the property which the receiver took, and which passed from him to the assignee, was property which had been the

property of the firm, and had passed to Long under the agreement of December 7th, 1869; but the receiver took also some goods which Long had bought in his own name. The assignee had in his hands some proceeds of the latter goods mingled with proceeds of goods which had been the property of the firm. But, as the parties, after all the testimony was taken, stipulated, in writing, that no dividend had been made out of funds arising from property which never belonged to the partnership, the court concluded that they were agreed to treat the proceeds of all the property which came to the assignee from the receiver as being the proceeds of property which had been the property of the firm and had passed to Long under the agreement of December 7th, 1869.

2 [The assignee has realized from such property about $7,500; he has also now in his hands about $5,000 besides, which is confessedly the separate estate of Long. Creditors to the amount of $23,261.89, have proved debts against the co-partnership, such debts having all of them been created prior to December 7th, 1869. In March, 1872, the assignee paid a dividend of four per cent. on such co-partnership debts out of the proceeds of the property received from the receiver, there being at that time no other funds in the hands of the assignee, and no proof of debt having then been made except on debts originally incurred by the firm. Macfarlane, in his petition in bankruptcy, set forth as his claims against the co-partnership, five promissory notes made by the firm, dated, severally, September 25th, 1869, for $550 31; September 30th, 1869, for $586 16; October 31st, 1869, for $607 45; November 5th, 1869, for $602 31, and November 10th, 1869, for $602 31, and one promissory note made by Long, individually, dated November 13th, 1869, for $746 58. The five notes amounted to $2,948 54, and the six to $3,695 12. On the 23d of May, 1870, Macfarlane filed a proof of debt against the bankrupts as co-partners, claiming a debt of $8,531 52, with interest from December 6th, 1869, as the balance of an account annexed to the proof. The debit items in the account consist of debits for merchandise sold by Macfarlane to the firm, running from September 2d, 1869, to December 6th, 1869, and amounting to $10,307 51. Against this there are credits by seventeen notes, amounting to $10,277 48, and a deduction amounting to $30 03, in all, $10,307 51; all of the seventeen notes, except three, are debited against as protested notes; those three amount to $1,745 97, and with the $30 03, to $1,775 99; deducting this from the $10,307 51 leaves the $8,531 52. Copies of the six promissory notes before mentioned, for $550 31; $586 16; $607 45; $602 31; $602 31, and $746 58, are annexed to the proof, and the proof states that they were given for

2 [From 9 N. B. R. 227.]

merchandise sold by Macfarlane to the firm. Such six notes are found on both the debit and the credit sides of such account. On the claim so approved, Macfarlane, on the 18th of March, 1872, received from the assignee a dividend of $349 21 out of the proceeds of the property so received from the receiver. Three individual creditors of Long (one of whom is Elizabeth H. Long) have proved debts against his separate estate to the amount of $5,650 16, such debts appearing by such proofs to have been incurred by Long alone, and not having been proved as debts against the firm.

[In July, 1873, Macfarlane filed a proof of debt against Long, individually, for $8,693-61, on thirteen promissory notes, being the six notes before mentioned, for $550 31; $586 16; $607 45; $602 31, and $602 31, and $746 58, severally, and seven others, of which two are made by the firm, one dated November 17th, 1869, for $603 32, and one dated December 6th, 1869, for $589 13, and five are made by Long, individually and dated severally, November 24th, 1869, for $703 21; November 27th, 1869, for $693 42; November 30th, 1869, for $726 13; December 14th, 1869, for $498 65, and December 22d, 1869, for $509 38; the thirteen notes amount to $8,-018 36; of the thirteen, seven are made by the firm, amounting to $4,140 99, and six by Long, individually, amounting to $3,877 37; of the thirteen, the eleven, which are dated on or prior to December 6th, 1869, are set forth in the account annexed to the proof of debt of May 23d, 1870, the amount of the eleven being $7,010 33, of which seven are notes made by the firm, amounting to $4,-140 99, and four are notes made by Long, individually, amounting to $2,869 34. Three of the fourteen protested notes, debited in the account annexed to the proof of debt of May 23d, 1870, are not claimed in the proof of debt of July, 1873, being notes made by the firm and dated severally, October 7th, 1869, for $536 16; October 13th, 1869, for $492 52, and October 18th, 1869, for $492 51. Macfarlane, in his evidence, claims that these three notes are due to him but are lost. All of the notes were three months' notes. The proof of debt of July, 1873, sets forth. that on or about the 7th of December, 1869, Long assumed or agreed to pay the said indebtedness of the firm to Macfarlane, and thereupon the said indebtedness became, and was, and is, the separate and individual indebtedness of Long to Macfarlane. It would seem, from the proof, that the $8,693 61 included interest to the date of adjudication, April 30th, 1870. The proof credits the $349 21 as a dividend from the estate of the bankrupts. On the application of the three individual creditors of Long, before mentioned, proceedings have been instituted to examine Macfarlane's proof of July, 1873. Testimony has been taken thereon and the matter is now presented for decision.

[The agreement of December 7th, 1869, was never shown to any of the creditors of the firm, and none of such creditors have released Corey from the debts of the firm. Macfarlane testifies that he has not released Corey from liability to him on the indebtedness of $8,-531 52, and that he still holds Corey responsible for his share of it. The individual notes of Long for $746 58; $703 21; $693 42, and $726 13, are shown to have been given for goods sold to the firm by Macfarlane before its dissolution, and charged to the firm by him on his books. Those four notes, though dated in November, were given after December 7th, 1869, and covered the purchases for which no firm notes had been given. Macfarlane testifies, that when those notes were given, Long informed him that the firm was dissolved, and that he, Long, had assumed the debts, and would settle for them with his individual notes. I understand the evidence also to show that after December 7th, 1869, Long signed in the name of the firm and gave to Macfarlane the firm's note of December 6th, 1869, $589 13, for goods bought by the firm from Macfarlane prior to its dissolution and for which no note had before been given. Long, in his testimony, expresses himself surprised to find he had given the four individual notes, and accounts for his doing so, by saying that he cannot tell how it happened, but supposes he did it hastily. Some of the merchandise bought from Macfarlane for which such four notes were given passed into the hands of the receiver; some, but not all, of the property which the receiver took and which passed from him to the assignee, was property which had been the property of the firm and had passed to Long under the agreement of December 7th, 1869, but the receiver took also some goods which Long had bought in his own name. It would seem from the testimony that the assignee has in hands some proceeds of the latter goods mingled with proceeds of goods which had been the property of the firm. But as the parties, after all the testimony was taken, stipulated, in writing, that no dividend has been made out of funds arising from property which never belonged to the partnership, I conclude that they are agreed to treat the proceeds of all the property which came to the assignee from the receiver as being the proceeds of property which had been the property of the firm and had passed to Long under the agreement of December 7th, 1869.][2]

Long did not contradict the testimony of Macfarlane as to what he, Long, said when he gave his four individual notes to Macfarlane, but admitted that, after the dissolution of the firm he, Long, purchased goods on his individual order and account from Macfarlane, and said that he supposed he explained to Macfarlane that the partnership was dissolved, and that Macfarlane came to the store at various times after the dissolution and saw him, Long, doing business on his own

2 [From 9 N. B. R. 227.]

account. After the 7th of December, 1869, Long, buying goods on his own account and in his own name, and selling some of them, deposited the proceeds in bank in his own name, mingled with the proceeds of sales of the goods which had belonged to the firm, and drew on such fund in bank to pay his individual debts and also debts of the firm.

On the foregoing facts, the following issues were certified for determination by the court: (1.) Does the fund received by the assignee from the receiver constitute, and is it to be treated and distributed as, a part of the separate estate of Long; or is it partnership property, to be applied, in the first instance, to the payment of partnership debts? (2.) Is Macfarlane, in respect to the debts originally incurred by Walter P. Long & Co., and afterwards assumed by Long, entitled to be admitted to the list of Long's separate creditors? (3.) Is Macfarlane, in respect to the debts originally incurred by Walter P. Long & Co., and afterwards assumed by Long, entitled to share in dividends out of Long's separate estate, equally with separate creditors? (4.) Is not Macfarlane, in respect to the individual notes of Long held by him, entitled to be admitted to the list of Long's separate creditors? (5.) If the second, third and fourth questions are answered in the negative, then is not the fund collected from the receiver to be applied, in the first instance, to the satisfaction of joint debts?

T. N. Bangs, for Macfarlane.

J. K. Hill and H. T. Wing, for the three individual creditors.

BLATCHFORD, District Judge. It is contended, for Macfarlane, that the effect of the agreement of December 7th, 1869, was to transfer to Long the title to the whole of the partnership property, free from any exclusive lien or equity in favor of creditors of the firm, the transfer not being coupled with any condition that the partnership property shall be applied by Long to the payment of the partnership debts, but there being only a personal agreement by Long to pay the debts of the firm and hold Corey free from them; that Corey, while changing the right of property in the partnership assets, intended, by the agreement, to substitute, for the protection of himself and of the creditors of the firm, Long's individual covenant to pay the partnership debts; that this covenant made Corey Long's individual creditor; that the assignee has succeeded to Corey's right of action on this covenant, and can enforce it to the extent of compelling Long's separate estate to perform such covenant equally with Long's other personal obligations; that the creditors of the firm, for whose benefit such covenant was made, have a right to enforce such covenant, either at law or in equity, in their own names; that the funds collected by the assignee from the receiver constitute a part of Long's separate estate; and that

Macfarlane, in respect to his whole claim, less the dividend, is entitled to share, on an equal footing with the individual creditors, in dividends out of Long's separate estate.

It is contended, for the three individual creditors of Long, that the debts of the firm to Macfarlane were not, by the agreement of December 7th, 1869, converted into the separate debts of Long; that such agreement could not impair the liability of the copartners, or of either of them, to a creditor of the firm, without the consent of such creditor; that there is no evidence that Macfarlane accepted the individual liability of Long for the joint liability of the firm and of its members; that on the contrary, the copartners, as such, were adjudged bankrupts, on the application of Macfarlane, on a part of the debt in question, and he proved his claim on the whole thereof against the firm and its joint estate, and received a dividend thereon out of funds which all parties regarded at the time as funds of the copartnership estate; that, if the agreement of December 7th, 1869, is valid, the property of the firm which was transferred thereby became the separate property of Long, free from any claims of Macfarlane, as a creditor of the firm, and the funds received by the assignee from the receiver should not be treated as joint estate, or as applicable to the payment of joint debts, but should be applied, in the first instance, to pay the debts of the three individual creditors of Long, and any balance remaining should go to the creditors of the firm; that the second proof of debt of Macfarlane—that against Long alone—should be stricken out; that the claims of the three individual creditors of Long should be paid in full out of all the funds in the hands of the receiver, before making any distribution of the same to Macfarlane; and that, if that cannot be done, then the assets collected by the assignee from the receiver should be applied to the debts incurred by the firm, and the other assets in the hands of the assignee should be applied to the claims of the three individual creditors of Long.

The provisions of the insolvent statutes of Massachusetts (1838, c. 163, § 21, and 1860, c. 118, §§ 108, 109) are the same as provisions found in the 36th section of the bankruptcy act.

[2][In Howe v. Lawrence, 9 Cush. 553, two partners, Shaw and Gardner, dissolved their partnership, Shaw conveying to Gardner all his interest in the partnership property, and Gardner agreeing, in consideration therefor, to pay all the joint debts. Gardner subsequently went into insolvency, and a greater portion of the assets which went into the hands of the assignee was property which had been owned by the firm. Debts against the firm were proved against Gardner's estate, and private debts against Gardner were proved. The question arose, whether the

[2] [From 9 N. B. R. 227.]

separate creditors of Gardner should be paid in full and the balance go to the joint creditors of the firm, or whether all that part of Gardner's estate which had formerly belonged to the firm should go to the creditors of the firm, to the exclusion of the separate creditors of Gardner; or whether the entire estate should be distributed pari passu to the joint and separate creditors. Shaw was in insolvency, separately, in another country, and there was no property of the firm except what so passed to Gardner. The supreme court of Massachusetts in deciding the case hold, that where, on the dissolution of a co-partnership, the joint property is transferred to one of the firm and there is no fraud or collusion between the co-partners for the purpose of defeating the rights of the joint creditors, and the transaction is made in good faith, upon dissolution, and for the purpose of closing the affairs of the partnership, such joint property thereby becomes the separate estate of the transferee; that the mere fact of the transfer does not affect the rights of the joint creditors; that the joint property, after its transfer to one of the co-partners, is as much within the reach of legal process by the creditors of the firm as if it had remained the property of the partnership; that beyond such right to seize the joint property on legal process, the creditors of the firm have not, before proceedings in insolvency, any control over the partnership effects, or any right to restrain their disposition; and that if such transfer is made honestly and for a valuable consideration, the property becomes separate estate, wholly free from any claims of the joint creditors. To sustain these principles there are cited, as authorities, Colly. Partn. §§ 174, 894, 903; Story, Partn. § 358; Ex parte Ruffin, 6 Ves. 127; Ex parte Fell, 10 Ves. 347; Ex parte Williams, 11 Ves. 3; Ex parte Rowlandson, 1 Rose. 416; Campbell v. Mullett, 2 Swanst. 515; Allen v. Center Valley Co., 21 Conn. 130, 137; Ferson v. Monroe, 1 Fost. [21 N. H.] 462, 469. The court also hold, that it not appearing that the property transferred to Gardner was conveyed to him mala fide, and in fraud of the rights of creditors, the joint creditors had no right to require that such property should be appropriated primarily to the payment of the debts of the firm; that Shaw, by transferring the joint property to Gardner, and taking the personal contract of Gardner for the payment of the joint debts, discharged any lien he had to enforce the application, after dissolution, of the partnership effects to the payment of the joint debts, and substituted therefor the agreement of Gardner, and, therefore, no lien or trust on the part of Shaw remained which could be enforced on the partnership effects for the benefit of the joint creditors; that under the peremptory provisions of the statute (Act 1838, c. 163, § 21), requiring the net proceeds of the joint stock to be appropriated to pay the creditors of the firm, and the net pro-

ceeds of the separate estate of each partner to be appropriated to the payment of the separate creditors, the joint creditors of the firm could not be allowed to prove their debts against the separate estate of Gardner, and take dividends thereon pari passu with the separate creditors; and that if there was no joint estate, and no surplus of the separate estate after paying the separate debts, the creditors of the partnership could receive no dividend.

[In Robb v. Mudge, 14 Gray. 534, Train and Thayer being partners, Thayer assigned to Train, on the day of the expiration of the firm by limitation, all his interest in the property of the firm; and, in consideration thereof, Train, by the same instrument, agreed with Thayer to assume and pay all the debts of the firm, and to indemnify Thayer therefrom. Subsequently, Train individually went into insolvency, having a large individual estate, besides the property so conveyed to him. The creditors of the firm sought to prove their claims against the private estate of Train. The assignment of the assets of the firm to Train having been made in good faith, the court, on the authority of Howe v. Lawrence, held that such assets could not be treated as joint estate, or be applied to the payment of joint debts. It being urged that Train had, by the agreement, stipulated to assume and pay all the debts of the firm and indemnify Thayer therefrom, the court held that such stipulation gave no right to the creditors of the firm to treat Train as their separate debtor, and to prove against his private estate, because there was no evidence of any agreement or assent, on the part of such creditors, before the commencement of the insolvent proceedings, to accept Train as their individual debtor in lieu of the firm, and therefore there had been no conversion of joint debts into separate debts, and the case was not one of a conveyance of property in trust for the benefit of Thayer, or of creditors of the firm, but a transfer to Train for his own use, with a mere personal covenant by him to pay the debts of the firm. The court also held, on the authority of Howe v. Lawrence, that the creditors of the firm had failed to establish any right to prove against the separate estate of Train, on the ground that they were entitled to assert an equity against Train or his assets in the hands of the assignee, based on his stipulation in the agreement.

[In Wild v. Dean, 3 Allen, 579, Foss and Swett being partners, and owing firm debts, Swett purchased the interest of Foss in the partnership property, and executed to him a bond to pay all the debts of the firm. Subsequently the joint and separate estates of Foss and Swett were put into insolvency. After the warrant was issued, but before the first publication of notice, one Wild, the holder of notes made by the firm, gave a written notice to Foss and Swett severally, of his election to take Swett as his debtor

thereon, and to avail himself of the agreement by which Swett became bound to pay the firm debts. There was no joint estate. Wild sought to prove the notes against the estate of Swett. A distinction was attempted to be drawn between this case and that of Robb v. Mudge, on the ground that Wild had elected to take Swett as his sole debtor, and had given notice of such election before the time at which the statute required that a debt should be due from a debtor in order to be provable. But the court held, that it was not shown that Swett had agreed or assented that the joint debt should be converted into a separate debt on which he and his estate were liable, as upon a contract into which he had individually entered; 'that the debtor cannot convert a joint into a separate debt without the consent of the creditor, and the creditor can do no act to effect such conversion without the assent of the debtor; that the existence of a "separate debt" due to a creditor from one of two co-partners, which is necessary, under the statute, to entitle the creditor to prove against the estate of such one of two co-partners, is not proved by showing that the creditor holds a joint note of the firm, and that, on a dissolution of the firm, one of the firm stipulated with his co-partner to assume and pay all the joint debts, and the election of the creditor does not of itself operate to convert a joint into a separate indebtment, and there must be evidence of a promise, either express or implied, to the creditor, by such stipulating co-partner, to assume and pay the joint debt as his own private individual debt, so as to convert a joint into a separate promise; and that Wild could not prove his debt against the separate estate of Swett.

[The cases of Howe v. Lawrence, and Robb v. Mudge, are cited, with approval by the court of appeals of New York, in Dimon v. Hazard, 32 N. Y. 65.][2]

In Re Downing [Case No. 4,044], in Missouri, Downing and Emerson, being copartners, dissolved by consent, Downing purchasing all the assets of the firm from Emerson, and agreeing with him to pay all its liabilities. Eight months afterwards, Downing assigned all his assets, including those which came from the firm, to a trustee, for the equal benefit of all his individual creditors and the creditors of the firm. After that, Downing was adjudged a bankrupt, in Missouri, and the trustee turned over the proceeds of the assets to the assignee in bankruptcy. The copartnership, as such, was not adjudicated bankrupt. Emerson was adjudicated a bankrupt in Massachusetts. The creditors of the firm did not release Emerson from liability. Claims against Downing individually, as well as claims against him as one of the firm, were proved against his estate. After his voluntary assignment, and before he was adjudged a bankrupt, he delivered to each one

of the creditors of the firm a written agreement, under seal, signed by him, reciting the dissolution of the firm, the conveyance to Downing of the assets of the firm, for a consideration given by Downing to Emerson, the agreement by Downing to assume and pay all the debts of the firm and hold Emerson harmless from the same, and then saying, "I have agreed to pay the debts and liabilities of said firm, as my own private individual debts, and the party with whom this agreement is made may now have debts and claims against said firm," and then going on to agree with the creditor, for value received of him, "that I individually, will pay, as my own private and individual debts, all and singular the debts, liabilities and claims against said firm of Downing & Emerson," held by the creditor. The question arose, whether the separate creditors of Downing should be first paid in full before the creditors of the firm should receive any dividends from the funds in the hands of the assignee. The district court ruled in favor of the separate creditors. The circuit court reversed the ruling. The view it took was, that, as the result of Downing's agreement with Emerson to pay all the liabilities of the firm, the creditors of the firm had the right, as between themselves and Downing, to treat Downing as individually liable to them on his promise to Emerson for their benefit, and could enforce such promise against him, in equity (citing 1 Pars. Cont., 5th Ed., 467, 468, and cases cited, and 2 Greenl. Ev. § 109, and cases cited); that such promise, on the election of the creditors of the firm to avail themselves of it, is cumulative to their other rights; that they need not release the firm in order to be able to obtain the benefit of such promise; that such creditors may assent to and claim the benefit of such promise at any time, either before or after the bankruptcy of the promisor; and that, while the parties made the firm's property the individual property of Downing, Downing superadded his individual liability to the existing liability to the creditors of the firm. But the court further held, that, even if the foregoing views were erroneous, the 36th section of the bankruptcy act only comes into operation when there are firm assets, and the bankruptcy proceedings are against the firm and each of its members; and that, as there was no joint property, and the bankruptcy proceedings were only against Downing, and not against the firm, all of the creditors of Downing, who had proved their debts, were entitled to share pro rata in the distribution of his estate, whether their debts were originally against the firm or against Downing individually.

In the present case, as the bankruptcy proceedings are against both of the copartners, as such, the provisions of the 36th section must apply, I think, even though there is no joint property. Whether they would not apply if the proceedings were against one copartner alone, as held by the court in Mis-

---

[2] [From 9 N. B. R. 227.]

souri, it is not necessary to consider. In Howe v. Lawrence. the insolvency proceedings were against one partner alone, and yet the court cite the statute as applicable. So, also, in Robb v. Mudge, the insolvency proceedings were against one partner alone.

On the authorities referred to, there can be no question, that, in this case, the transfer of the firm property to Long having been made honestly, and in good faith, upon a dissolution, and for a valuable consideration, and without any fraud or collusion between the copartners to defeat the rights of the joint creditors, the joint property became, by the transfer, the separate property of Long. The more difficult question is, what are to be considered "separate debts" of Long, to the payment of which the statute requires his separate estate to be first appropriated. There was no "joint stock or property of the copartnership" at the time of the commencement of the proceedings in bankruptcy, and none such passed to, or has come to, or is in the hands of, the assignee.

The 36th section draws a distinction between "the creditors of the copartnership" and the "separate creditors" of each partner. It also calls the former "joint creditors" and speaks of the debts due to them as "joint debts," while it speaks of the debts due to such separate creditors as "separate debts." It puts joint creditors and joint debts in antithesis to separate creditors and separate debts. This it does, although, necessarily, the copartners are jointly and severally liable to the creditors of the copartnership for the joint debts. This liability is recognized by the 36th section, because, after the separate estate of each partner has been appropriated to pay his separate creditors, the section does not direct the balance of such separate estate to be paid over to the partner, but directs it to be added to the joint stock for the payment of the joint creditors. It recognizes the liability of the separate estate for the joint debts, on the basis of a several liability of each partner for the firm debts, but it arbitrarily postpones such liability to the liability of the separate estate for the separate debts. It, therefore, seems to me, that, when the statute is to be construed with a view to see what are the separate debts which are first to be paid out of the separate estate, the separate debts spoken of must be regarded as being confined to debts which arise out of a liability other than, or in addition to, that resulting solely from a debt contracted by the firm.

In the present case, the debts to Macfarlane were contracted originally solely by the firm, for goods sold by him to the firm. What has occurred to make the liability of Long in respect to them a liability other than, or in addition to, that resulting from his having been a member of the firm when the debts were contracted?

The transaction of the agreement of December 7th, 1869, is relied on; and the cove-

nant therein, on the part of Long, to pay all the debts of the firm, in consideration of Corey's agreement, and of Corey's assignment to Long of all Corey's interest in the assets of the firm, is alleged to have created, when assented to by Macfarlane, a separate liability on the part of Long, in addition to that resulting from his having been a member of the firm, to respond, as a separate debtor, to Macfarlane, for the debts of the firm to Macfarlane, and thus to have made Macfarlane, in respect of such debts, a separate creditor of Long, entitled to share in the separate estate of Long, in addition to his right to share, as a creditor of the firm, in any joint property there might be. This is the view taken in the Downing Case. The view of the supreme court of Massachusetts, in the cases before cited, is, that where the one partner sells out the firm property to the other, and takes the personal contract of the latter to pay the joint debts, he thereby deprives a joint creditor of any right to share, as a separate creditor of the latter, in his separate estate, in its distribution under the statute, although the latter agrees with the former to personally pay the joint debts, in consideration of the conversion of the firm property into such separate estate, unless the joint creditor assents to accept the latter as his individual debtor in lieu of the firm, and does so before the statutory proceedings are commenced, and unless, further, the latter, by an express or an implied promise, made to the joint creditor, promises to assume and pay the joint debt as his own private, individual debt, in such wise as to convert the joint debt into a separate debt on which he and his separate estate are to be liable as upon a contract entered into by him individually.

It is with hesitation that any court, in administering a provision of the bankruptcy act which is like in terms to one which is found in the insolvent law of Massachusetts, and has been adopted therefrom, and has been expounded by the highest court of Massachusetts, would venture to differ from the well considered decisions of that court in regard to such provision. But I find it impossible to concur in the view just stated as the view of that court. The view taken in the Downing Case seems to me much the more reasonable one, and to be more consonant with the equitable principles on which the bankruptcy act is to be administered. See, also, to the same effect, In re Knight [Case No. 7,880]. Long, by his agreement, not only agreed, as between himself and Corey, to pay all the debts of the firm, having received all its property, but put himself voluntarily into the position, as respected the creditors of the firm, of agreeing that such creditors might, if they chose, treat him as so liable individually, and in respect of all his separate estate, including what became such by the transfer, in addition to his liability as a joint contractor, and

in addition to Corey's liability for the joint debts. Neither of these latter two liabilities was, as respected the joint creditors, affected by the agreement. They could accept the additional individual liability of Long, while retaining the liabilities of both Corey and Long as contracting copartners, in like manner as they could have taken the individual indorsement by either of a promissory note made by the firm. The individual promise of Long could as well be made to Corey for the benefit of the creditors of the firm, as to each one of such creditors for his own benefit, especially when all the firm property, undoubtedly embracing some for the purchase of which the very debts in question were contracted, was being eo instanti transferred to Long for his individual benefit. Certainly, although the agreement was only between Corey and Long, and the firm creditors were not cognizant of it, it cannot be said that it ought not to be regarded as having been made for, and as enuring to, their benefit, when all the firm property was becoming the individual property of Long. Corey was not a mere stranger. He was a joint debtor with Long, and he and Long held joint property, and, in transferring the whole of the interest in such joint property to Long, and exacting an individual promise by Long to pay such joint debts, he was acting on a state of things in respect of which the joint creditors had quite as much interest as he had, that Long should fulfill such promise. Long received an adequate consideration for his promise. He has retained all the property, and the debts he assumed to pay are not paid. Why should the firm creditors be required to release the firm, or to release Corey as a member of the firm, in order to enjoy the benefit of such promise; and why should they not be allowed to elect to avail themselves of such promise as well after the commencement of the bankruptcy proceedings as before? The case seems to me to fall within the principles of those cases where a firm creditor, having also the individual liability of one of the firm in respect to the same debt, has been allowed to prove it against such individual as well as against the firm. In re Bigelow [Case No. 1,397]; Mead v. National Bank of Fayetteville [Id. 9,366]; Emery v. Canal Bank [Id. 4,446]; In re Bradley [Id. 1,772].

The issues certified must, therefore, be answered, as follows: The fund received by the assignee from the receiver constitutes, and is to be treated and distributed as, a part of the separate estate of Long, and it is not partnership property, to be applied, in the first instance, to the payment of partnership debts; and Macfarlane, in respect to the debts originally incurred by Walter P. Long & Co., and afterwards assumed by Long, is entitled to be admitted to the list of Long's separate creditors, and to share in dividends out of Long's separate estate, equally with separate creditors.

[Although the two individual notes of Long, dated after December 7th, 1869, are embraced in the second proof of debt, they form no part of the $8,531 52 mentioned in the first proof of debt, and are not set forth in the statement of account annexed to the first proof of debt, and as it does not appear that they were given for debts of the firm, I have not regarded them as involved in the questions now determined.] [2]